# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

PROTECT OUR COMMUNITIES
FOUNDATION, *et al.*,

                                    Plaintiffs,

        vs.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

                                    Defendants.

CASE NO. 11-CV-00093 BEN (BGS)

**ORDER DENYING PLAINTIFFS'
MOTION FOR INJUNCTION
PENDING APPEAL**

[Docket No. 40]

Presently before the Court is Plaintiffs' Motion for Injunction Pending Appeal. (Docket No. 40.) For the reasons stated below, Plaintiffs' Motion for Injunction Pending Appeal is **DENIED**.

## BACKGROUND

This case arises from the "Sunrise Powerlink Project," a 117-mile transmission line projected to run Northwest from Imperial County to San Diego County, in California. On January 20, 2009, the Bureau of Land Management ("BLM") approved Sunrise Powerlink in a Record of Decision ("ROD") after circulating a draft environmental impact statement ("DEIS"), a supplemental draft environmental impact statement ("SDEIS"), and final environmental impact statement ("EIS"). On July 9, 2010, the U.S. Forest Service ("USFS") approved Sunrise Powerlink's route through the Cleveland National Forest in a separate ROD. As a cooperating agency, USFS adopted the EIS prepared by BLM without recirculating it. The transmission line, which is supported by massive towers, except for an

underground segment in Alpine, runs along the Final Environmentally-Superior Southern Route ("FESSR"). Plaintiffs The Protect Our Communities Foundation, Backcountry Against Dumps, East County Community Action Coalition, and Donna Tisdale seek to preserve the serene rural community in East San Diego County. SDG&E intervened on the grounds that it is building the $1.9 billion transmission line.

Plaintiffs have previously challenged decisions issued by BLM and the Fish and Wildlife Service ("FWS") in the related action, *Backcountry Against Dumps v. Abbott*, Case No. 10-CV-1222 BEN (BGS) ("*Sunrise I*"). In that action, Plaintiffs contended that the defendants violated several federal statutes, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70; Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701-87; Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44; and National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq*. Plaintiffs challenged several stages of the environmental review process by BLM and FWS. On June 30, 2011, the Court granted the defendants' motion for summary judgment, and denied both Plaintiffs' and SDG&E's motions for summary judgment as moot. The Court also denied Plaintiffs' motion for preliminary injunction as moot. Plaintiffs appealed (1) the order denying Plaintiffs' motion for a preliminary injunction as moot, and (2) the order granting the defendants' motion for summary judgment and denying Plaintiffs' motion for summary judgment. On August 12, 2011, the Court denied Plaintiffs' Motion for Injunction Pending Appeal. On August 20, 2011, the Ninth Circuit denied Plaintiffs' Emergency Motion for Injunctive Relief Pending Appeal.

On January 14, 2011, Plaintiffs filed the present action. Plaintiffs challenge USFS' approval of Sunrise Powerlink's route through the Cleveland National Forest. The Complaint asserts six claims: (1) the Forest Service violated NEPA by approving Sunrise Powerlink and the related Forest Plan amendments based on an inadequate EIS; (2) BLM and the Forest Service violated NEPA by failing to prepare a SEIS to address substantial post-EIS project changes, new information, and new circumstances; (3) the Forest Service's approval process for Sunrise Powerlink violated the National Forest Management Act ("NFMA"); (4) the Forest Service's approval of Sunrise Powerlink violated the Forest Plan and thus NFMA; (5) the Forest Service's approval of Sunrise Powerlink violated FLPMA; and (6) FWS violated the ESA by failing to reinitiate Section 7 consultation.

On August 16, 2011, Plaintiffs filed a Motion for Preliminary Injunction, which was denied on September 15, 2011.  (Docket Nos. 16, 39.)  On October 28, 2011, Plaintiffs appealed the Order Denying Plaintiffs' Motion for Preliminary Injunction.  (Docket No. 41.)

Presently before the Court is Plaintiffs' Motion for Injunction Pending Appeal.  (Docket No. 40.)  A hearing was originally scheduled for December 5, 2011.  The hearing was later vacated pursuant to Local Civil Rule 7.1.d because (1) Plaintiffs extensively briefed the issues, and (2) Plaintiffs The Protect Our Communities Foundation, Backcountry Against Dumps, East County Community Action Coalition, and Donna Tisdale requested that the hearing be vacated because Plaintiffs' counsel was unavailable for the December 5 hearing (Docket No. 44).

## DISCUSSION

According to Federal Rule of Civil Procedure 62(c), "While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."  Rule 62(c), however, "does not restore jurisdiction to the district court to adjudicate anew the merits of the case." *Natural Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (internal quotation marks omitted).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

An injunction is "not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 129 S. Ct. 1749, 1760 (2009) (internal quotation marks omitted).  Instead, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 21. The determination whether to grant an injunction is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 129 S. Ct. at 1760 (internal quotation marks omitted).  Furthermore, there is no presumption that an injunction should issue, even in environmental cases. *The Lands Council*

*v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ("Our law does not . . . allow us to abandon a balance of harms analysis just because a potential environmental injury is at issue."), *overruled in part on other grounds by Winter*, 555 U.S. at 20, *as recognized by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *id.* ("[W]e decline to adopt a rule that *any* potential environmental injury *automatically* merits an injunction, particularly where . . . the plaintiffs are not likely to succeed on the merits of their claims.").

## I.  LIKELIHOOD OF SUCCESS ON THE MERITS

The Court will only consider the arguments raised by Plaintiffs that directly challenge the findings of the September 15 Order. *See Natural Res. Def. Council, Inc.*, 242 F.3d at 1166 (Rule 62(c) "does not restore jurisdiction to the district court to adjudicate anew the merits of the case." (internal quotation marks omitted)).  As Plaintiffs did not challenge the Court's analysis in regards to USFS' approval of Sunrise Powerlink under NFMA, that part of the September 15 Order will not be addressed.

### A.  USFS' Adoption of the EIS

The September 15 Order agreed with Plaintiffs that a cooperating agency may adopt an EIS only if it "meets the standards for an adequate statement under these regulations."  40 C.F.R. § 1506.3(a).  Plaintiffs argue that the Court erred by finding that USFS did not violate NEPA through its adoption of the EIS, because (1) the EIS fails to clearly describe and analyze the selected route of Sunrise Powerlink, (2) the EIS fails to consider a renewable energy transmission requirement alternative, (3) the EIS fails to adequately address growth inducing impacts, (4) the EIS' analysis of environmental impacts is inadequate, (5) the EIS fails to establish the need for additional capacity, and (6) USFS and BLM failed to prepare a SEIS to address substantial post-EIS project changes, new information, and new circumstances.

#### 1.  Description and Analysis of the Selected Route

Plaintiffs argue that the DEIS, SDEIS, and EIS are inadequate because they (1) analyze a project different from the one ultimately approved, (2) fail to describe and address the impacts of the selected route as a whole, and (3) fail to provide the information necessary to foster adequate public

1    participation.

2        The purpose of the EIS is to analyze numerous alternatives from which each agency could

3    select a route in a ROD.  *See* 40 C.F.R. § 1505.2; *see also* AR:A:1052:42103 (explaining that the EIS

4    "is purely informational in content, and will be used by the [agencies] in considering whether to

5    approve the Proposed Project or any of the alternatives analyzed").  SDG&E proposed a northern route

6    for Sunrise Powerlink.  (*See* AR:A:1052:42108-09.)  In order to identify "reasonable alternatives

7    which would avoid or minimize adverse impacts," 40 C.F.R. § 1502.1, Interstate 8 Alternative was

8    presented as a potential southern route, and the BCD, Route D, and Modified Route D Alternatives

9    were presented as alternative routing segments within the Interstate 8 Alternative.  (*See, e.g.*,

10   AR:A:1052:42107-08, 42128, 42138.)  As explained in the September 15 Order, the public

11   commented on the proposed northern and southern routes.  (Sept. 15 Order, at 5 (citing

12   AR:A:1056:SPL38243, SPL41613).)[1]  In addition, the EIS describes the FESSR both textually and

13   graphically, and analyzes the impacts of each FESSR segment.  (*Id.* (citing AR:A:1057:SPL42076,

14   SPL42089; AR:A:1052:42107-08, 42163-71, 42171, 45796-97, 45886-6339, 46340-478, 46597-806,

15   42107-08, 42177-81, 45803-04, 45679-841; AR:A:1054:SPL24841-995).)  This process allowed the

16   public and agencies to consider numerous combinations and their impacts before selecting a final

17   route: the FESSR.  (AR:A:1052:42107-08 (EIS describing FESSR); AR:A:722:38453 (BLM ROD

18   selecting FESSR); Frueh Decl. [Docket No. 28-2], Exh. 6, at 2-4 (USFS ROD selecting FESSR).)

19   There was no last minute "bait-and-switch"; the options were disclosed to the public and reviewed by

20   the agencies.

21        In addition, Plaintiffs object to several of the Court's citations to the administrative record.

22   In regards to the Court's conclusion that the Project's impacts were adequately analyzed, Plaintiffs

23   argue that ES-5 to ES-6 do not analyze the Project's impacts; the analysis on ES-75 to ES-79 is

24

25   ———————————

26   [1] Plaintiffs argue that the Court "assum[ed] that public comments on the proposed northern route were sufficient to meet NEPA's public participation requirements for the much different southern route."  (Mot. at 13 (internal quotation marks and alteration omitted).)  The September 15 Order, however, clearly states that "the public commented on the proposed northern route, as well as the alternatives analyzed in the DEIS, *including the southern routes*."  (Sept. 15 Order, at 5 (emphasis added).)

27

28

inadequate because it is limited to four categories: biological, fire and fuels, environmental justice, and agricultural; and the table on H-124 to H-125 is incorrect because it presents two sections describing different impacts that are both entitled "Final Environmentally Superior Southern (SWPL) Alternative." The September 15 Order cited several sections of the EIS in support of its conclusion that the EIS analyzed each FESSR segment and summarized potential impacts. (Sept. 15 Order, at 5 (citing AR:A:1052:45886-6339, 46340-478, 46597-806, 42107-08, 42177-81, 45803-04, 45679-841).) Each of these citations should be considered together, as an EIS is "an integrated document" that "must be weighed in its entirety." *N. Slope Borough v. Andrus*, 642 F.2d 589, 601 (D.C. Cir. 1980); *see also WildWest Inst. v. Bull*, 547 F.3d 1162, 1172 (9th Cir. 2008) (court must "review [an] EIS as a whole"). Together, these citations show that the Project's impacts were adequately analyzed.

In regards to the Court's conclusion that the EIS described the FESSR, Plaintiffs argue that the pages of the EIS cited by the Court do not contain descriptions of the route, but rather contain only listings of technical segment names, alternatives, and reroutes. Specifically, Plaintiffs argue that ES-5 does not list the approved route segments and that neither ES-5 nor ES-6 discusses the five route revisions to the Interstate 8 Alternative. On the contrary, ES-5 identifies the ultimately selected route as the Interstate 8, BCD, and Modified Route D Alternatives. (AR:A:1052:42107-08.) ES-6 explains that this route incorporated five revisions to the Interstate 8 Alternative and three revisions to the Modified Route D Alternative. (AR:A:1052:42108.) After noting these revisions, ES-6 directs the reader to a "detailed discussion in Section ES.7.2," where each revision was fully described and explained. (AR:A:1052:42108, 42163-71.) Presenting the information in this way does not amount to a NEPA violation. *See Bull*, 547 F.3d at 1172 (the court must "review [an] EIS as a whole").

In addition, Plaintiffs argue that (1) ES-61 fails to mention the three route revisions for the Modified Route D Alternative, and fails to refer the reader to ES-5; (2) ES-61 to ES-69 do not describe the selected route; and (3) ES-69's reference to the "Jacumba Breakaway Revision" conflicts with ES-61's reference to the "Jacumba SWPL Breakaway Point Reroute." Moreover, Plaintiffs argue that the EIS pages cited in the September 15 Order are confusing because they span over 70 pages in four separate sections of the EIS.

ES-61 to ES-69 spans Section ES.7.2.1.   At the beginning of Section ES.7.2.1, the EIS explains:

> Section ES.7.2.1 [ES-61 to ES-69] describes the Interstate 8 Alternative's five route options and subsequent revisions, and defines which are required to be the environmentally superior Interstate 8 Alternative.  This is then compared to the BCD Alternative, Route D Alternative, and Modified Route D Alternative and the options within these alternatives to determine an overall Environmentally Superior Southern Route Alternative.

(AR:A:1052:42164.)   After discussing these alternatives, ES-69 identifies the route segments that create the FESSR, and then refers the reader to Figure ES-4 for a graphical illustration of the route.  (AR:A:1052:42171.)   All together, the full presentation of the FESSR is only ten pages long, in addition to a map.   Although the EIS first refers to a route alternative as "Jacumba Breakaway Revision," then "Jacumba SWPL Breakaway Point Reroute," this does not amount to a NEPA violation. *See Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) (the court may not "fly-speck the [EIS] and hold it insufficient on the basis of inconsequential, technical deficiencies" (internal quotation marks omitted)).

Lastly, Plaintiffs argue that the maps cited by the September 15 Order are confusing.  Plaintiffs argue that (1) the "Southwest Powerlink Alternatives Retained" map circles multiple alternatives, but does not identify the final route, and (2) the ES-4 map likewise identifies multiple alternatives and its reference to the "Star Valley Option if feasible" conflicts with the map on ES-17, which describes the route as the "Star Valley Option Revision."   As explained in the September 15 Order, however, it is permissible to revise a route in response to comments.  (Sept. 15 Order, at 4 (citing 40 C.F.R. § 1503.4(a)).)   Furthermore, as explained above, the Court may not "fly-speck the [EIS] and hold it insufficient on the basis of inconsequential, technical deficiencies." *Morrison*, 153 F.3d at 1063.

### 2.    Renewable Energy Transmission Requirement Alternative

Plaintiffs object to the September 15 Order's conclusion that the EIS considered all reasonable alternatives to Sunrise Powerlink.  First, Plaintiffs argue that the Court's assertion that a renewable energy transmission requirement is speculative and impractical defies Powerlink's goal of renewable energy transmission and undermines any chance of fulfillment.  This mischaracterizes the September

11cv00093

1   15 Order.   The Order in fact found that the EIS' rejection of a renewable energy transmission

2   requirement as speculative and impractical was not arbitrary or capricious, and therefore did not violate

3   NEPA.  *See* Sept. 15 Order, at 6; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350

4   (1989) ("NEPA itself does not mandate particular results, but simply prescribes the necessary

5   process.").

6           Second, Plaintiffs argue that the EIS wrongly dismisses as infeasible the In-Area Renewable

7   Alternative and undergrounding of some or all of the transmission line.   These concerns were already

8   addressed in the September 15 Order (*see* Sept. 15 Order, at 6-7), and Plaintiffs do not identify any

9   error in the Court's analysis.   Accordingly, the Court will not revisit these arguments here.  *See*

10  *Natural Res. Def. Council*, 242 F.3d at 1166 (Rule 62(c) "does not restore jurisdiction to the district

11  court to adjudicate anew the merits of the case."  (internal quotation marks omitted).)

12                          **3.      Analysis of Growth Inducing Impacts**

13          Plaintiffs object to the Court's conclusion that the EIS adequately analyzes the growth inducing

14  impacts of Powerlink.   Plaintiffs attempt to re-argue that the EIS fails to analyze Powerlink's growth

15  inducing impacts, but simply repeat the arguments already raised in their Motion for Preliminary

16  Injunction.  (*Compare* Mot. at 14, *with* Mot. for Prelim. Inj. at 6.)   Accordingly, the Court will not

17  revisit this issue here, as explained above.

18                          **4.      Analysis of Environmental Impacts**

19          Plaintiffs object to the Court's conclusion that the EIS' analysis of environmental impacts is

20  adequate.   First, Plaintiffs once again attempt to re-argue that the EIS' analysis of biological and

21  cultural resources is inadequate.   Plaintiffs reassert the arguments presented in their previous Motion

22  for Preliminary Injunction, which the Court will not consider here, as explained above.  (*Compare*

23  Mot. at 15-17, *with* Mot. for Prelim. Inj. at 7-9.)   Plaintiffs also argue that the Order's conclusion that

24  the EIS contains adequate surveys for biological and cultural resources is refuted by the "fragmented

25  and incomplete nature" of the biological and cultural resource surveys.  (Mot. at 16.)   As explained

26  in the September 15 Order, however, the EIS contains many surveys for biological and cultural

27  resources.  (Sept. 15 Order, at 7-8 (citing AR:A:1052:42752-53, 45928-29, 45920-02, 46618-23,

28

1    45930-31, 46359-60, AR:A:1054:SPL26044).)  The EIS did not violate NEPA.  *See Bull*, 547 F.3d at

2    1172 (court must "review [an] EIS as a whole").

3         Second, Plaintiffs argue that the Order's assertion that the EIS "analyzes topography, slope,

4    vegetation, precipitation, and proximity to fire suppression as key factors when it analyzes fire risk for

5    each of the route's thirteen firesheds," (Sept. 15 Order, at 8), overlooks that (1)  the EIS does not

6    analyze Powerlink's selected towers, access roads, and staging areas, and (2) the EIS fails to show

7    where the route traverses the firesheds.  As the September 15 Order stated, however, the EIS analyzes

8    each FESSR fireshed both textually and graphically, including impacted areas such as firefighting.

9    (*Id.* (citing AR:A:1052:46302-18, 45804).)  In addition, Plaintiffs argue that although the Order and

10   EIS acknowledge that the transmission line would create five areas in which wildfire containment

11   activities would be restricted "to a very high degree," they do not indicate where these areas are.  On

12   the contrary, these five areas are identified by milepost marker, as noted in the Order.  (*Id.* (citing

13   AR:A:1052:46327, 46803).)  Furthermore, Plaintiffs argue that the EIS fails to address the increase

14   in fire hazards from new energy facilities along the selected route.  As the Order found, however, the

15   EIS analyzes cumulative fire impacts from numerous construction activities, including new energy

16   generation facilities where reasonably foreseeable. (*Id.* at 8-9 (citing AR:A:1052:42409-13, 45659-69;

17   AR:A:1056:SPL38385-86).)

18        Third, Plaintiffs argue that the Court erred when it found that NEPA does not require agencies

19   to include speculative information in the EIS, citing *National Parks & Conservation Association v.*

20   *Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001) ("A generic statement that the effects are unknown does

21   not constitute the requisite 'hard look' mandated by the statute if preparation of an EIS is to be

22   avoided."), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743,

23   2757 (2010).  As explained in *Tribal Village of Akutan v. Hodel*, although an agency may not omit

24   ascertainable facts from an EIS, NEPA does not require agencies to include speculative information.

25   869 F.2d 1185, 1192 n.1 (9th Cir. 1988).  Here, the EIS explains that it was not possible to predict with

26   certainty future emissions from renewables.  (*See* Sept. 15 Order, at 9 (citing AR:A:1052:44584-87).)

27   Nonetheless, the EIS quantifies emissions of carbon dioxide, basing its findings on U.S. EPA,

28

SDG&E, and California Independent System Operator ("CAISO") forecasts and modeling, and analyzes climate change impacts of the alternatives and compares these impacts to FESSR impacts. (*See id.* (citing  AR:A:1052:42399-403, 44582-90, 46995, 47216, 47406, 47513-14, 45812).)  This is not an instance in which the agency simply made a "generic statement that the effects are unknown" in order to avoid preparation of an EIS.  *See Babbitt*, 241 F.3d at 733.

Fourth, Plaintiffs object to the Court's finding that the EIS adequately analyzes visual resource impacts.  Plaintiffs argue that the EIS addresses only the visual impacts of the proposed northern route, rather than the selected southern route.  On the contrary, the EIS contains information on the selected route.  (AR:A:1052:43285-532, 46011-63, 46376-91, 46514-63, 46639-63.)  In addition, the EIS includes photographic simulations of the transmission structures, descriptions of methodology, and discussion of the impacts to key viewpoints, including McCain Valley.  (AR:A:1052:46376-91, 46639-63.)  Furthermore, Plaintiffs argue that the EIS does not adequately discuss the impact of the red marker balls that will be placed on the transmission lines.  The EIS, however, analyzes the use of marker balls along major roadways and canyon crossings, and concludes that visual impacts will be significant and unmitigable.  (*See* AR:A:1052:42513, 42379-81; AR:A:1057:SPL42423.)  Lastly, Plaintiffs argue that the EIS merely mentions that wind farms have a potential for cumulative visual impacts, without analyzing these impacts.  As explained in the September 15 Order, however, the EIS addresses cumulative impacts on visual resources, including all reasonably foreseeable cumulative impacts and impacts of renewable energy facilities.  (*See* Sept. 15 Order, at 9 (citing AR:A:1052:45628-31, 45666, 45592, 45530-31; AR:A:1056:SPL38392-93).)

**5.    Purpose and Need Statement**

The September 15 Order concluded that the EIS briefly specifies the underlying purpose and need to which the agency is responding.  First, Plaintiffs argue that the purpose and need statement in the EIS fails to evaluate the public need for the Project.  The EIS, on the contrary, considered the public's interest in reliable, inexpensive, and renewable energy, and considered over a 100 alternatives to achieve this goal.  (AR:A:1052:42106, 42441-43.)  As discussed in the September 15 Order, the EIS relies on CAISO's and CPUC's conclusions that a need existed for Sunrise Powerlink.  (See Sept. 15

1    Order, at 10.)

2         Second, Plaintiffs argue that contrary to the Court's observation that "California's expert

3    agencies concluded that a need existed for Sunrise Powerlink," (Sept. 15 Order, at 10), the CPUC

4    Administrative Law Judge concluded that a need did not exist.  The conclusions of the CPUC

5    Administrative Law Judge, however, were rejected by the CPUC.  (*See* AR:A:568:35834 ¶ 7

6    (discussing CPUC findings concluding that a need existed for Sunrise Powerlink); CPUC Rules of

7    Practice & Procedure, R. 9.1 (ALJ rulings "do not involve final determination of proceedings").)  The

8    EIS properly relies on the CPUC's conclusion that a need existed for Sunrise Powerlink.  *See Marsh*

9    *v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views,

10   an agency must have discretion to rely on the reasonable opinions of its own qualified experts even

11   if, as an original matter, a court might find contrary views more persuasive.").

12                          **6.      Preparation of a SEIS**

13        The September 15 Order held that Defendants were not required to prepare a SEIS under

14   NEPA.  First, Plaintiffs argue that the Order misstated the law.  The Order cited *Township of*

15   *Springfield v. Lewis* for the proposition that project modifications that "unquestionably mitigate

16   adverse environmental effects of the project . . . generally do not require a supplemental EIS." (Sept.

17   15 Order, at 10 (quoting *Springfield v. Lewis*, 702 F.2d 426, 436 (3d Cir. 1983).)  Plaintiffs argue that

18   "[t]he test for preparation of an SEIS here is not whether all the disparate impacts combined will be

19   greater than they were before the project changes; the test is whether *any individual* change may have

20   a significant environmental impact."  (Mot. at 21.)  Plaintiffs cite 40 C.F.R. § 1502.9(c)(1) for this

21   proposition.  Section 1502.9(c)(1), however, only requires a SEIS where "(i) [t]he agency makes

22   substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here

23   are significant new circumstances or information relevant to environmental concerns and bearing on

24   the proposed action or its impacts."  In addition, the Ninth Circuit has recently confirmed that "[w]hen

25   the change to the proposed action is a 'minimizing measure,' the agency is not automatically required

26   to redo the entire environmental analysis because a minimizing measure's effects on the environment

27   will usually fall within the scope of the original NEPA analysis." *Russell Country Sportsmen v. U.S.*

28

*Forest Serv.*, No. 10-35623/No. 10-35784, 2011 U.S. App. LEXIS 20666, at *28 (9th Cir. Oct. 12, 2011) (internal quotation marks and alterations omitted); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1221 (11th Cir. 2002) ("Given the mitigation and the beneficial alterations to the project, the Corps did not act arbitrarily and capriciously in determining that a supplemental environmental impact statement was not required.").

Second, Plaintiffs argue that the Court failed to address the newly identified cultural resource impacts on BLM and other lands that Plaintiffs discussed in their Motion for Preliminary Injunction. The changes identified in the Project Modification Report ("PMR") reduced impacts to cultural resources on BLM land from 80 to 20, and there are now only 28 cultural resource impacts along Sunrise Powerlink. (*Sunrise I*, Colton Decl. [Docket No. 146] ¶ 15.) Plaintiffs do not identify new significant impacts to cultural resources that arise from project modifications, and a reduction in impacts does not usually "constitute a substantial change . . . relevant to environmental concerns." *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218 (10th Cir. 1997); *Russell Cnty. Sportsmen*, 2011 U.S. App. LEXIS 20666, at *27-28. Although Plaintiffs cite the Cultural Resources Attachment to the PMR Memorandum, this discusses surveys conducted along the FESSR pursuant to mitigation measures that successfully reduce impacts to culture resources. (*See* Frueh Decl. [Docket No. 28-3], Exh. 10, Intro., at 9 ("[A]s required by mitigation presented in the Final EIR/EIS, SDG&E has completed a 100 percent cultural resources survey of the FESSR and Modified Project and refined the placement of towers, roads, and other facilities to avoid direct impacts to cultural resources.").)

Third, Plaintiffs argue that the Court wrongly concluded that the changes made to the Project route do not require a SEIS because they were analyzed in the EIS and may result in an overall decrease in impacts. Plaintiffs argue that the route modifications were not analyzed in the EIS, the EIS did not contain the required environmental impact analysis, and the BLM's ROD and PMR are non-NEPA documents. Plaintiffs, however, do not support their argument that the individual refinements result in significant environmental impacts.[2] The sole reroute Plaintiffs cite, the BCD Alternative

---

[2] The fire risks Plaintiffs identify are not new impacts; rather, they are risks produced by a different modeling methodology that was already considered and rejected in the EIS. (*See* Sept. 15 Order, at 11-12.)

Revision, was expressly contemplated in the EIS.  (*See* AR:A:1052:46342; AR:A:1057:SPL42495.)

Moreover, the PMR Memorandum provide evidence that the reroute did not result in any new significant impacts not already considered in the EIS.  (Frueh Decl. [Docket No. 28-3], Exh. 10 (PMR Mem.), at 2-44 to 2-47.)  In addition, the use of non-NEPA documents is permissible to determine whether to prepare a SEIS.  *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) ("Although NEPA requires agencies to allow the public to participate in the preparation of an SEIS, there is no such requirement for the decision *whether* to prepare an SEIS.").

Fourth, Plaintiffs argue that the September 15 Order erroneously concluded that the EIS visual impact analysis provides that red marker balls would be placed on the transmission lines, and so is not a new impact.  Plaintiffs argue that the EIS does not confirm that there would be red marker balls on the transmission line, and does not specify their number or location.  The EIS, however, analyzes the use of marker balls along major roadways and canyon crossings, and concludes that visual impacts will be significant.  (*See* Sept. 15 Order, at 12 (citing AR:A:1052:42513, 46378; AR:A:1057:SPL42423.)  Identifying the number and location of the marker balls would not have influenced the EIS' analysis or significance finding.  (*See* Frueh Decl. [Docket No. 28-3], Exh. 10 (PMR Mem.), Intro., at 5 ("[FESSR] would result in significant and unmitigable visual impacts due to the presence of the new transmission line," and "the definition of marker sphere locations does not substantially increase the severity of this impact.").)  No SEIS is required.  *See Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997) (no SEIS required if there is no new significant impacts).

Fifth, Plaintiffs argue that the September 15 Order stated that the EIS analyzes the impacts of lighting on night-flying birds and bats, but failed to acknowledge that the analysis does not address the use of infrared lighting or its impact on birds and bats.  The EIS, however, analyzes collision impacts on night flying birds and finds the impacts to be significant and unmitigable, though it is difficult to ascertain their likelihood.  (*See* AR:A:1052:42891-93.)  The use of infrared lighting as a mitigation measure is not expected to directly attract birds or bats, and the likelihood of indirect effects on collisions remains inconclusive.  (*See* Frueh Decl. [Docket No. 28-3], Exh. 10 (PMR Mem.) § 1, at

3-5; *see also id.* at 5 ("The addition of infrared lighting is not expected to result in a significant impact or to substantially increase the severity of effect to bird or bat species.").)  Plaintiffs' citation to the SIR does not resolve the uncertainty addressed in the EIS or show new significant collision impacts,[3] and absent such a showing, no SEIS is required.  *See La. Wildlife Fed'n v. York*, 761 F.2d 1044, 1051 (5th Cir. 1985).

Sixth, Plaintiffs argue that the September 15 Order wrongly decided that the determination that the arroyo toad's habitat is critical, as opposed to occupied, does not amount to new information requiring a SEIS.  Plaintiffs argue that a change in legal status of a species constitutes a changed circumstance necessitating preparation of a SEIS, citing *Olympic Forest Coalition v. U.S. Forest Service*, 556 F. Supp. 2d 1198, 1207 (W.D. Wash. 2008), and *Dombeck*, 222 F.3d at 559.  As explained in the September 15 Order, however, when an agency's finding of potential negative environmental impacts on a species is not premised on the habitat's designation as occupied, as opposed to critical, the later determination that the habitat is critical does not amount to new information requiring a SEIS.  *Cf. Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 344 (9th Cir. 1996) (finding that because the Forest Service's previous determination that the proposed project would not likely have a negative impact on salmon "was not premised on the salmon's non-threatened status, the determination that the salmon were in fact threatened did not constitute new information" requiring the preparation of a SEIS).  Plaintiffs' authorities are not to the contrary.  *See Olympic Forest Coal.*, 556 F. Supp. 2d at 1207 (requiring a SEIS because the intervening invalidity of the ROD, on which the EA was based, was not analogous to a mere "change in the legal status of a species"); *Dombeck*, 222 F.3d at 559 & n.5 (SEIS required in light of sensitive species designations where, "before the onset of this action, the Forest Service never considered the effect of the proposed timber sales on the seven species at issue").

---

[3] *See* Frueh Decl. [Docket No. 28-2], Exh. 8 (SIR), at 10 ("no meaningful basis" for discerning collision impacts caused by infrared lighting).

**B.     USFS' Approval of Sunrise Powerlink Under FLPMA**

Plaintiffs contest the Court's conclusion that Plaintiffs have not shown that USFS' approval of Sunrise Powerlink likely violated FLPMA.  First, Plaintiffs argue that USFS failed to include terms that would minimize or eliminate many of Powerlink's impacts, and that USFS should have required avoidance of the Cleveland National Forest's resources, such as the Back Country Non-Motorized Land Use Zone.  These concerns were already addressed in the September 15 Order (*see* Sept. 15 Order, at 14-15), and Plaintiffs do not identify any error in the Court's analysis.  Accordingly, the Court will not revisit these arguments here. *See Natural Res. Def. Council*, 242 F.3d at 1166 (Rule 62(c) "does not restore jurisdiction to the district court to adjudicate anew the merits of the case." (internal quotation marks omitted).)

Second, Plaintiffs argue that the September 15 Order fails to provide "any explanation or even a record citation" to support the Court's conclusion that deviations of Sunrise Powerlink from the West-Wide Energy Corridor minimizes impacts.  (Mot. at 24.)  This information was not provided in Section I.C of the Order, because these issues were already discussed in Section I.A.6.  (*See* Sept. 15 Order, at 11.)  The Order referred the parties to Section I.A.6 with the signal "as discussed above." (*See id.* at 15.)

Overall, the Court did not err in its determination that Plaintiffs are not likely to succeed on the merits.

**II.     LIKELIHOOD OF IRREPARABLE HARM**

**A.     Plaintiffs' Delay in Bringing the Motion**

The September 15 Order found that Plaintiffs' delay in bringing the Motion for Preliminary Injunction weighed against finding that Plaintiffs would suffer irreparable harm if an injunction were not issued. First, Plaintiffs argue that they did not delay in bringing the Motion for Preliminary Injunction because they filed a motion for preliminary injunction "to prevent construction of the *entire* Sunrise Powerlink project" in *Sunrise I* on April 16, 2011, four months before construction began on August 16, 2011.  (Mot. at 2.)  According to Plaintiffs, "all parties to the present suit have been focused on the lead case, [*Sunrise I*]—the most logical and time-efficient approach to minimizing the

burden on the Court and the parties in adjudicating plaintiffs' challenge to the Powerlink project." (Reply at 3.)   In addition, Plaintiffs argue that "a succession of federal judges refused to hear the motion [for preliminary injunction in *Sunrise I*], severely prejudicing plaintiffs. Had plaintiffs' motion been timely heard—and granted—by this Court, no construction would have started on August 16." (Mot. at 2.)   Plaintiffs, however, made a strategic decision to concentrate their efforts on *Sunrise I*. Plaintiffs were not prevented from filing a motion for preliminary injunction in the present action while the motion for preliminary injunction in *Sunrise I* was still pending.   Moreover, the judges originally assigned to *Sunrise I* did not "refuse to hear the motion," but rather recused from the case.

Second, Plaintiffs argue that it was sufficient that they sought a preliminary injunction in the present action on August 16, 2011, the day that defendants claimed construction would begin.  As explained in the September 15 Order, however, Plaintiffs were informed that construction would begin in the Cleveland National Forest in April 2011, four months earlier.  (Sept. 15 Order, at 16.)  This was also over a year after USFS approved the Project.  Such delay weighed against finding that Plaintiffs would suffer irreparable harm if an injunction were not issued.  *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 79-80 (4th Cir. 1989) (denying injunction sought on the eve of construction, nine months after the ROD and EIS issued).  Moreover, Plaintiffs were not required to wait until construction in the CNF began to file the Motion for Preliminary Injunction.  *See West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 930 n.14 (9th Cir. 2000) ("Plaintiff need not wait until construction begins . . . to challenge . . . the agencies' decisionmaking.").

Third, Plaintiffs argue that counsel for SDG&E and USFS told Plaintiff "that there was no basis for a preliminary injunction and assured plaintiffs that they would give adequate notice to plaintiffs prior to any construction on USFS lands."  (Reply at 3.)  As explained in the September 15 Order, however, there is evidence that Plaintiffs were notified that construction would begin in the Cleveland National Forest in April 2011.  (Sept. 15 Order, at 16.)  For instance, SDG&E's filings with this Court in *Sunrise I* informed Plaintiffs that construction would begin by August 2011.  (*See, e.g.*, *Sunrise I*, Woldemariam Decl. [Docket No. 147], ¶ 34.)  In addition, on April 8, 2011, counsel for SDG&E told Plaintiffs' counsel that construction would begin in the Cleveland National Forest in mid-August 2011.

(*Sunrise I*, Schneider Decl. ¶ 2.)

Fourth, Plaintiffs argue that the cases the Court relied on in its September 15 Order, *Quince* and *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985), are inapposite because the plaintiffs in those cases sought preliminary injunctions several months after the challenged actions were authorized. This is incorrect. Plaintiffs did not seek a preliminary injunction in this action until almost a year after USFS approved the Project, similar to the plaintiffs in *Quince* and *Citibank*. *See Quince*, 872 F.2d at 79-80 (nine month delay); *Citibank*, 756 F.2d at 276 (same). *Quince* and *Citibank* are not inapposite. The Court did not err in its determination that Plaintiffs' delay in bringing the Motion for Preliminary Injunction weigh against finding that Plaintiffs would suffer irreparable harm if an injunction were not issued.

### B.   Harm Caused by Sunrise Powerlink

Plaintiffs argue that although the Court correctly held that some environmental harm is likely to result if an injunction is not issued, the Court erroneously disregarded many of Plaintiffs' alleged harms as either reparable or not imminent, and understated the significance of others.

First, Plaintiffs argue that the Court overlooked precedent that establishes that the destruction of natural areas—even if not inhabited by any special status species—constitutes irreparable harm, citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011), *Conservation Congress v. U.S. Forest Service*, __ F. Supp. 2d __, 2011 WL 1087463 (E.D. Cal. 2011), and *Sierra Club v. Eubanks*, 335 F. Supp. 2d 1070 (E.D. Cal. 2004). The September 15 Order, however, in fact acknowledged that Plaintiffs cited to *Cottrell*, but then explained that *Cottrell* confirmed that there is no presumption that an injunction should issue, even in environmental cases. (Sept. 15 Order, at 16 (citing *Cottrell*, 632 F.3d at 1135).) *Conservation Congress* likewise confirms that "the Ninth Circuit has declined to adopted a rule that any potential environmental injury automatically merits an injunction, particularly where, as in this case, we have determined that the plaintiffs are not likely to succeed on the merits of their claims." *Conservation Cong.*, 2011 WL 1087463, at *5 (internal quotation marks and alteration omitted). Lastly, although the court in *Eubanks* concluded that irreparable injury would result from the logging operations at issue there, it did not establish a rule that an injunction should automatically issue in environmental cases. *See Eubanks*, 335 F. Supp. 2d at 1083. Indeed, the court in *Eubanks* granted an injunction because it concluded that all the factors

1 weighed in favor of granting a preliminary injunction.  *Id.* at 1077-84.

2       Second, Plaintiffs contest the September 15 Order's analysis in regards to Plaintiffs' ability to

3 view, experience, and utilize Cleveland National Forest lands.  Plaintiffs argue that "the Order states

4 that plaintiffs *only* 'list the Hauser Mountain Wilderness Study Area, Hauser Canyon, and the Pacific

5 Crest Trail as areas that would experience significant visual impacts'" while Plaintiffs in fact "showed

6 that the Project would cause substantial visual impacts along its *entire route* through the CNF,

7 including Thing Valley, Cameron Valley, El Monte Valley and the Japatul Valley Road area."  (Mot.

8 at 3 (quoting Sept. 15 Order) (first emphasis added).)  The Order, however, recognized that "Plaintiffs

9 argue that construction and operation of the Project will directly impact *numerous* wildlands in the

10 CNF, many of which, like the La Posta Valley, are considered by the Forest Service to be part of an

11 unspoiled corridor with expansive views." (Sept. 15 Order, at 17 (emphasis added) (internal quotation

12 marks omitted).)  In denying injunctive relief, courts "need only make brief, definite, pertinent findings

13 and conclusions," and "there is no necessity for over-elaboration of detail or particularization of facts."

14 FED. R. CIV. P. 52, advisory committee's note.

15       In addition, Plaintiffs argue the Court incorrectly found that "[t]he areas that Plaintiffs claim

16 are 'unspoiled,' such as the La Posta Valley, already contain manmade structures, such as Southwest

17 Powerlink, Interstate 8 (a four-lane highway), three mining districts, and a right-of-way for wind

18 energy site testing and monitoring."  (Sept. 15 Order, at 17.)  The September 15 Order should have

19 read that the "the areas that Plaintiffs claim are 'unspoiled,' such as the La Posta Valley, already

20 contain manmade structures, such as transmission lines and Interstate 8 (a four-lane highway)."

21 Although the mining districts and wind energy right-of-way are on BLM land, the fact remains that

22 the Cleveland National Forest contains manmade structures.  (*See* Woldemariam Decl. [Docket No.

23 28-6], Exh. 5 (showing transmission lines and Interstate 8 crossing the Cleveland National Forest).)

24 The Court's analysis remains unchanged, as the Court concluded that some environmental harm is

25 likely to result if an injunction is not issued.  (*See* Sept. 15 Order, at 18.)

26       Moreover, Plaintiffs argue that the Court overlooked that "the Project will degrade [Plaintiffs']

27 views from within the Wilderness Areas and impair their ability to visually enjoy the Wilderness Areas

28 from afar." (Mot. at 4.)  The Court, however, did not overlook Plaintiffs' argument.  The September

15 Order recognized that Plaintiffs argued that "construction and operation of the Project will directly

11cv00093

impact numerous wildlands in the CNF, many of which, like the La Posta Valley, are considered by the Forest Service to be part of an unspoiled corridor with expansive views," and listed areas that Plaintiffs claimed would experience significant visual impacts. (Sept. 15 Order, at 17 (quoting Pl. Mot. for Prelim. Inj. at 20).) In addition, the September 15 Order observed that USFS required extensive mitigation to reduce or offset impacts to visual resources. (*Id.*)

Third, Plaintiffs argue that the Order misstated the amount of Quino checkerspot butterfly occupied habitat that will be impacted when it relied on Alan Colton's testimony. The Court's reliance on Mr. Colton's Declaration was justified. Mr. Colton attested to his personal knowledge of Powerlink's impacts to the CNF as the Sunrise Manager of Environmental Services, and explained how impacts to the Quino checkerspot butterfly habitat were reduced from 6.14 to 3.89 acres. (Colton Decl. [Docket No. 29] ¶¶ 1-8 (personal knowledge, professional experience, and background); *id.* ¶¶ 40, 45 (variation from the PMR is the result of "further reductions in temporary work areas anticipated in the USFS Supplemental Information Report (at 4), and further refinement of the project's engineering and design" (internal quotation marks omitted)).) The Court may properly weigh conflicting testimony when ruling on a motion for preliminary injunction. *See Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 897 (3d Cir. 1987). In addition, Plaintiffs argue that the Court failed to acknowledge that the Project's impacts on endangered species habitat could not be mitigated to a level less than significant. The September 15 Order, however, recognized that some environmental harm is likely to result if an injunction is not issued. (Sept. 15 Order, at 18.)

Fourth, Plaintiffs argue that the Court did not acknowledge the Project's watershed impacts and overlooked the testimony of Professor Robert Curry that the measures in place to mitigate watershed impacts will be ineffectual. The September 15 Order, however, acknowledged Plaintiffs' argument that Sunrise Powerlink will impact USFS-designated riparian conservation areas, and will have extensive erosion impacts on those and other sanative water resources in the Cleveland National Forest. (*See* Sept. 15 Order, at 18.) The September 15 Order then identified evidence to the contrary, in the way the EIS addresses impacts to water resources and outlines the mitigation measures that will reduce such impacts, and the way USFS adopted a vegetation restoration plan. (*Id.*) In addition, the Court may properly weigh conflicting testimony when ruling on a motion for preliminary injunction. *See Kulick*, 816 F.2d at 897.

Fifth, Plaintiffs argue that the Court's finding that the wildfire and fire suppression risks entailed by Powerlink are not imminent is incorrect because (1) the presence of transmission towers and high-tension power lines alone impedes firefighting, and (2) there is no guarantee that the Court will decide this action on the merits before the transmission lines are energized in less than a year.  For one, although any large structure will influence fire-response planning, "fires are commonly fought safely and successfully around transmission lines using all available firefighting tactics—including retardant and water drops from aircraft."  (Shreve Decl. [Docket No. 28-8] ¶ 15.)  The September 15 Order also noted that there will be extensive fire prevention and mitigation measures during both the construction and operation of Powerlink.  (*See* Sept. 15 Order, at 18.)  In addition, Plaintiffs' concern that "there is no guarantee" that this action will be resolved before Powerlink's completion does not satisfy their burden of demonstrating that irreparable harm is likely.  *See Winter*, 555 U.S. at 20.

### III.   BALANCE OF EQUITIES AND THE PUBLIC INTEREST

The September 15 Order found that Plaintiffs have not shown that the balance of equities and public interest favor granting an injunction.  Plaintiffs argue that the Court dismissed some of Plaintiffs' alleged harms as either reparable or not imminent, and understated others, biasing the Court's balance of harms analysis.

First, the Court found that the CPUC rejected Mr. Bill Powers' argument that SDG&E will not experience a shortfall of transmission capacity if Sunrise Powerlink is not built.  Plaintiffs argue that the Court incorrectly relied on CPUC's analysis, because five recent developments "have rendered entirely obsolete the projections of electricity capacity need relied on by SDG&E in its application to construct the Powerlink and by the CPUC in its Decision D.08-12-058" approving the Project. (Powers Decl. [Docket No. 18-1] ¶ 5.)  The "five more recent developments" Powers cites are:

> (1) substantially lower load growth projections by the CEC in 2011 compared to 2007, (2) aggressive new electricity demand reduction targets defined in the September 2008 *California Energy Efficiency Strategic Plan*, (3) twice as much local solar PV in development in SDG&E territory than was assumed in the Powerlink decision, (4) the addition of at least 280 MW of new local combined heat and power ("CHP") to SDG&E territory by 2020 to meet the CHP target in the December 2008 California Air Resources Board *AB 32 Scoping Plan*, and (5) SDG&E's May 2011 application for approval of power purchase agreements for 450 MW of new local gas turbine capacity.

(*Id.*)  These "developments," however, do not render CPUC's conclusion "entirely obsolete."  As for

the first development, CPUC reasonably relied on the California Energy Commission's 2007 load-growth forecasts in approving Sunrise, cognizant that such forecasts may vary from time to time. (Strack Decl. [Docket No. 28-9] ¶ 23.)  As for the second development, *targets* are not the same as forecasts.  "A target, upon which Mr. Powers' opinion relies, is an aspiration or hope; in contrast, an adopted forecast, upon which the CPUC relied, is the regulatory agency's best reasoned judgment at a given point in time of what will likely happen in the future.  In making decisions on behalf of consumers, consumers are best served when the CPUC decides on the basis of what is likely to happen (i.e. a forecast), not on what it, or others, might wish to happen."  (*Id.* ¶ 29.)  As for the third development, although the CPUC agreed in part with certain observations made by Utility Consumers' Action Network (an opponent of Sunrise), it "assumed that installed solar photovoltaic generating capacity in year 2016 will be 180.3 MW, not the much larger amounts recommended by Powers Engineering."  (*Id.* ¶ 26.)  As for the fourth development, "the CPUC articulated its views as to the amount of CHP that was adopted for purposes of evaluating Sunrise and the alternatives.  Notably, the CPUC adopted the CEC staff's lower forecast of non-solar photovoltaic distributed generation additions in the San Diego area, which includes CHP, rather than those recommended by Powers Engineering."  (*Id.* at 28.)  As for the fifth development, the parties cite no evidence that the power purchase agreements have been approved by the CPUC, and these generating capacity additions would not offset the loss of capacity that will be realized if the generation additions assumed in the CPUC's analysis fail to materialize.  (*Id.* ¶ 31.)

Second, Plaintiffs argue that enjoining Powerlink would not prevent development of less impactful renewable energy, SDG&E can achieve the target of 33% renewable energy by 2020 without the Project, and the Project's benefits would be merely delayed if construction were enjoined.  In addition, Plaintiffs argue that the Court overlooked the economic benefits of building a local energy development alternative rather than Powerlink, and the jobs that constructing 1,000 MW of local photovoltaic capacity would create.  These arguments concerning alternatives to Sunrise Powerlink, however, amount to a policy fight that specialized agencies charged to protect the public interest are best suited to resolve.  *W. Watersheds Project v. Ken Salazar*, No. CV 11-00492 DMG (Ex), at 39 (C.D. Cal. Aug. 10, 2011) ("It is not this Court's role to substitute its own policy judgments for those of the legislature or an agency charged with overseeing matters within its expertise.") (Frueh Decl.

[Docket No. 28-5], Exh. 19).

Third, Plaintiffs take issue with the manner in which the Court distinguished *Cottrell* from the present action, by explaining that in *Cottrell*, the Forest Service concluded that the project at issue would not have a significant effect on the quality of the human environment and that an EIS was not required. *See* Sept. 15 Order, at 20 (citing *Cottrell*, 632 F.3d at 1130). Plaintiffs argue that "[t]his rationale assumes that an inadequate EIS does not violate NEPA." (Mot. at 8.) This was not the Court's finding. Rather, the Court found that the EIS at issue here was adequate. (Sept. 15 Order, at 4-13.)

Fourth, Plaintiffs point to CPUC's recent order halting Powerlink-related helicopter operations due to recent helicopter malfunction or pilot error, arguing that the Project poses significant safety risks. CPUC's order to ground Sunrise's helicopter operations, however, has since been lifted, and in fact lasted only seven days. (Colton Decl. [Docket No. 46-3] ¶¶ 11-14.) In addition, the incidents that gave rise to the work stop order did not involve any injuries to people or property. (*Id.* ¶ 11.)

Fifth, Plaintiffs argue that "it remains the law of this Circuit that the public interest in preserving nature and avoiding irreparable injury outweighs economic concerns." (Reply at 7 (internal quotation marks omitted).) As explained in the September 15 Order, however, courts may consider economic harm when determining whether to grant injunctive relief. (Sept. 15 Order, at 20 (citing *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010); *McNair*, 537 F.3d at 1005).) The Court did not err in its determination that the balance of equities and public interest do not favor granting an injunction.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Injunction Pending Appeal is **DENIED**.

**IT IS SO ORDERED.**

DATED: January 13, 2012

_____
Hon. Roger T. Benitez
United States District Judge

11cv00093